Good afternoon. The first case this afternoon is No. 06-3238, Crane v. Air Force. Ms. Holman. I would like to reserve five minutes for rebuttal. Okay. May it please the Court. This case revolves around a masonry worker at Nellis Air Force Base in Las Vegas, Nevada, an employee of the Air Force Base since 1990. It surrounds it around a barrier, that's a DC barrier, Class A barrier, which is an item that my client, Mr. Crane, designed initially during Desert Storm in the early 1990s. It was a prototype barrier that's been issued here. Basically, he had been asked by the Nellis Air Force Base to create a cheaper barrier, and he believed that if it was poured concrete rather than laying block, it would have been a cheaper, much more economical barrier. But he never submitted his proposal to the higher-ups in the military, correct? That is true. And all that he had ever done, even when he created or started with the DC barrier, that's actually, it's named after him, Donald Crane barrier, or A-Class barrier. He testified at the hearing that he had never, ever submitted any paperwork. That was all new to him when that was brought up at the hearing. He was never required to do that, because he was not a supervisor, he was not a manager. He was merely a masonry worker. Yes, he was given a tremendous amount of authority, because in the early 1990s, he was the only mason worker on the base. Well, even assuming he had permission to make the prototype barrier, who gave him permission to destroy it? That was only because he had to clean up the yard, and that would have been Sergeant Hubritz, that he was also responsible for cleaning up the yard, and that would have been in approximately February 2004. Long after any of this had transpired with regard to the Las Vegas Motor Speedway, that was early summer, it had been resolved, he had poured the concrete barrier in the fall, nothing had been done. It was Sergeant Hubritz who had advised him to go ahead and make it, pour it, and we'll see what the higher-ups do. That was what Sergeant Hubritz had testified to as well, with regard to his memo that he provided that information. Is that destroying the barrier? No, it was merely cleaning it up, and he had hired Sergeant Warrington to do that, and he went in and basically started to clean up the area. It was at Freedom Park, the parking lot near the base, and he was just told to clean it up, and that's basically what he was doing. If it was seen as destroying it, there were other things that were going on there as well. There was a tremendous amount of rumors going around about him providing these barriers to the Las Vegas Motor Speedway, and he had nothing to do with that. That was months after his proposal to the Las Vegas Motor Speedway had failed. Ms. Holdman, the AJ found that Mr. Crane used government concrete to build a barrier with initials of his private company to solicit personal private business. That's a finding in effect, and we can only reverse if there is no substantial evidence to support the board's decision. Why isn't that finding a substantial evidence? Just because he used the words LVMS, and that could be Las Vegas Masonry Service, he could have used ABCD. The crux of the issue is that this was merely a prototype barrier. ABCD would not have raised any influence or suggestion that he's doing this for his own private purposes. But even with the DC barrier, that was even named after him. He was teased about whether that should have been a pattern that he should have had with that because it was so successful and used around military bases across the country. But that was not even significant in his decision to have done that. But did he test it? So he presumably testified to that effect before the AJ, correct? As far as the Las Vegas Masonry Service, yes. I think AJ, who really has decision-making with respect to credibility, decided which witness testimony he believed and which he did not. So back to Judge Lurie's question, on what basis would we then, if he did it, reverse the AJ's decisions with respect to credibility? Well, I think his statement with regard to that escapes all credibility, his own statement that it was Las Vegas Masonry Service. He did not take into account that there were two other witnesses who corroborated that, Officer Sigman and Officer Warrington. Both testified that, yes, it was well known, LVMS, Las Vegas Masonry Service. And everybody knew he had this side business. I believe it was Sergeant Huberts who even further testified, it's like he said, a tattoo. That if you get a tattoo, you can show it to others to get work. And he did a lot of outside work. And he employed a lot of people on the base with regard to both civilian and military personnel on the side. And he paid them to do things for his own side business. And this project was even, you know, suggested by Sergeant Huberts. He's the one that said, gee, the Vice President of Operations was here at the Las Vegas Motor Speedway. They're interested in those barriers because they're quite nice looking. Go approach them. And he did. And he submitted a proposal, all within knowledge of Sergeant Huberts and Mr. Crane's superiors. Also, what's interesting is that in the investigation, they never interviewed Mr. Crane's supervisors, his immediate supervisors. They would have been told right away, yeah, he has permission to do this. And it was done right out in the open, in the fighting hall. Did you call them as your witnesses before the AHA? No, we had the statements in their reported investigation. And those statements were part of their, because they were part of the report, and they stated, where did this LVMS stand for? He understood it to be Las Vegas Masonry Service. And those were those two witness statements, Warrington and Sigmund. I gather it was undisputed that everyone knew he was doing outside work, is that right? Yes. And that it had been condoned by the Air Force. And that the supervisors and everyone else knew that he was using government equipment or whatever for his outside business. At what stage, it seems through the record, although it certainly is not fully fleshed out, that a change of management within the Air Force itself to people who thought this was a very strange arrangement, that someone should be on government premises with government materials, be doing outside work, and reacted rigorously. Is that actually what happened? Was it as simple as a change of management who felt that the past policies were seriously wrong? Or just what happened? No, I do believe that is a major part of it. You have Colonel Foti, who was just assigned to the base as commander of the civil engineering squadron in June of 2004, which is a year after any of this had transpired. He had never met Donald Crane before. And same with Russell Collins. He had never met Mr. Crane before. And then, yes, they probably started to see this somewhat strange arrangement, that because Mr. Crane is so passionate about his work, he loves his work, he kind of looks at everything as his little own project, but that's because he really enjoys his work. And he was well known to those, go ahead, hey, look at this opportunity available to you. And he would take those opportunities. He would help personnel even with their own personal things that they were doing. But he just had a great desire. And if you look at his employment history, it's full of commendations. He had a significant history over 14 years with the Air Force base that basically revealed, you know, he saved taxpayers money. Even when this prototype barrier was being made, he knew that the Air Force base was interested in at least 300 of those. He could reduce the cost significantly. It would have saved taxpayers over $200,000. That was his motivation. Then there was even talk that they would increase that order to 500 to 600. Isn't all this fact-finding a matter of credibility of witnesses? We don't have witnesses. We have to look at whether there was substantial evidence, in other words, a reasonable amount of evidence on which the board could rely. And I'm not hearing you tell us that there was not. I mean, you're sort of telling us a story, like he's a good guy. He did all sorts of good things for the government. But the real issue is whether there's substantial evidence that he did the specific things that he's accused of. Right, and that would be misuse of government property, and that did not occur here. And Foti, Colonel Foti's emphasis is on the use of the words LVMS, or those letters. And even he testified that when he spoke with the Las Vegas Motor Speedway, there was no discussion that that would even be those initials. It would be spelled out entirely in its name, and it would have maybe its emblem or whatever. But never LVMS was ever discussed, and that's just such a side issue that Colonel Foti just didn't take into account all of the history involved here, the working relationship that Mr. Crane had with his superiors, and the authorization to do this. But as far as the credibility, Mr. Crane did testify at a hearing. It's the Las Vegas Masonry Service, and he really was always forthcoming. If you look at his statements, July 19th, July 20th, 2004, a year after all this had transpired, he's still being extremely forthcoming and telling three or four pages worth of how he was going about doing this. And it was no different than what he had done in previous years. So that's why the, you know, then we get into the harshness of the penalty. And being that it was his first reprimand, meaning, excuse me, his first infraction or offense of any, if it even can be considered that, that is an inappropriate, you know, assessment of those penalty factors in light of this first infraction. When you have a new, you know, Colonel Foti on board, and he's having to admit Mr. Crane and is unaware of this working arrangement that's been done. But it wasn't a misuse of government property. It was a prototype. Yes, he was using those letters, and he always paid the employees with his own money. He paid for a lot of things with his own cash with regard to his own business. And he also worked with time that was, you know, time off the clock for those employees. Thank you. Good afternoon. And forgive me, I have a slight cold, so I may have to blow my nose. I apologize. As long as I don't get it too worse. Yes, sir. I think I'm at least ten feet back from you, so I think you're safe. I'd just like to, may it please the Court, I'm Captain Amina Deal, and I represent the Air Force in this case. And I'd just like to start off by addressing some of the issues that you yourselves have raised, Your Honors. Judge Lurie, one of the issues that you seem to point out, and rightly so, is the issue of substantial evidence. Because basically, you have to find that there was no substantial evidence on which the agency based its decision that the petitioner had committed the misuse of government property. I don't know if that's even an issue, but I'll tell you what's troubling me. Yes, ma'am. From the record, it looks as if everyone agrees, the Air Force agrees, and everyone else agrees, that these are things that Mr. Crane has been doing. It looked as if when he finally recognized that there was a change in management practices, John was on the line. Maybe he did destroy the prototype, as the record was mixed. Maybe that is indeed his initials, and not some other. But if, in fact, the Air Force has been more than tolerating, almost encouraging, this work, on the record, which just shows that this is a very talented mason, then doesn't it seem strange that this is quite a mock reaction? Had there been an instruction, no more outside work, or else, that that would be different. But it looks from the record as if there was quite a strong reaction, perhaps not even an inappropriate reaction to look at the history. This is where I have trouble. These are blanks in the record, but nobody seems to dispute this genesis of the case. Actually, ma'am, I think I can point to a couple of points in the record that will indicate that I don't believe that the Air Force condoned what Mr. Crane, or the petitioner, was doing. One of the things I'd like to point out to you is that at the appendix, at pages, I believe it's 174, Master Sergeant Heredia, who was Mr. Crane's supervisor for six years, was questioned at the hearing. And one of the issues was about Mr. Crane, whether Mr. Crane had ever had disciplinary action taken against him. And one of the things that Master Sergeant Heredia said was that, yes, in fact, he had had to discipline Mr. Crane for disruptive behavior. Okay, that's not an issue. However, what I find very interesting for this mason, who essentially worked without any supervision on very important projects, what I find very interesting is that Master Sergeant Heredia, and it's on page 175, was at line 8. It was mostly behavioral and the location of his work. And then if you'll turn to the next page, Master Sergeant Heredia goes on to say that Mr. Crane received verbal counselings because at times the whereabouts during his work assignments were at best questionable. So I think that it was, there was some concern even before the change of rating officials on the part of the Air Force that maybe this was a guy who was given a little bit, that they didn't really know what was going on all the time. They didn't charge him with AWOL, all of a sudden they came in and they said, well, you're a few years from retirement, you're fired. I don't know, there isn't anything in the record to say that there was enough evidence, that there was enough investigation to substantiate a charge of AWOL, but ma'am, you asked, was, you know, did the Air Force come down like a ton of bricks on this guy once the Office of Special Investigations started looking into things? And I would just submit to you is that although the evidence on the record is scanty, there is some evidence that they were a little, that there was some indication prior to this incident of misuse of government property that maybe Mr. Crane was not being, was being allowed to do things. Was there a warning? There was no warning, no ma'am. And I'll also just point out one more thing on this same issue, is that it was well known that Mr. Crane had a business on the side. However, that business was called DNS Restoration, and you can find that at Appellate Appendix, page 9. It's a footnote. Well, maybe no outside business should be tolerated. That's something that I think we perhaps should have no trouble with. But it was tolerated, whatever you call it. The problem with this particular incident of outside business is that if Mr. Crane is paying government employees on their off-duty time, out of his own pocket, to do side jobs, that might be one thing, and I don't know how the Air Force, you know, there's no evidence on the record. However, in this case... But you do know that he was never disciplined or warned or told to cut it out? There's no evidence on the record as to that, ma'am. So I don't know, but there's no evidence on the record, so yes. That's not what he was fired for this time. In this case, he was fired for specifically pouring government-procured concrete, and it's found... I mean, the charges are very specific, and you can find them at Appellate, I believe it's page 23, and it's paragraph 2A of the Notice of Proposed Removal. And in that case, the government said, Mr. Crane, petitioner, you got government-procured concrete. You used government equipment and used the government shop to pour this concrete. At the same time, you were engaged in a private negotiation with Las Vegas Motor Speedway. You just so happened to place the initials LVMS on this prototype, and there was hearing testimony that said, the Air Force officials said, it is absolutely improper to put any kind of personal logos on Air Force property. Let me just, to bring us back to Judge Newman's point. So your position, assuming AJ did not believe that the logos were something other than the speedway, which he found that they were the speedway. Correct. So assuming we accept that, then is there any evidence that he had engaged in this type of activity before, and that that activity had been condoned? There is no evidence that he had engaged in that activity before. I think I need to have clarification for the question, ma'am, because I think what Judge Newman, I believe what you're asking, ma'am, is that, hey, there was, the Air Force knew that this guy was working on his own time, you know, had a side business, and the Air Force thought that that was fine. I was doing the work on the Air Force premises, because these are massive pieces of equipment, I gather. But it's, what troubles me is, all of a sudden, without warning, without being told, we no longer condone your outside activities, we no longer condone your doing this work on Air Force premises, we no longer condone your hiring people and paying them on their own time. Cut it out. But instead, they say you're fired. I think, ma'am, that the issue is not so much that he was hiring Air Force employees on their own... Whatever it is, I don't want to... No, it's not... It looks, from the record, as if what he was doing was not that different from what he'd been doing for quite a while, with the knowledge of a lot of people. This is a pretty heavy, concrete activity. It isn't something that you can do in a back closet. Ma'am, there's no evidence about the type of work that he was doing before, so we don't know whether he was just using a soldering iron to engrave baseball bats for his kids, or whether that was the nature of DNS restoration. We don't know. But that's part of his job. This is a big project now, and he was using... The fact that he put the initials LVMS, whether that's Las Vegas Masonry Service or Las Vegas Motor Speedway, is irrelevant. You're not supposed to put your own personal logos on property that you're supposed to be building for Air Force use. He did have permission to build that prototype area, ma'am. He absolutely had permission to build that. He checked with his supervisor. The supervisor gave him a thumbs-up and said, Why don't you build a prototype? We'll see if higher supervision will buy off on it. Mr. Crane never submitted that prototype for anybody's inspection in his chain of command. What was the substantial evidence that... I keep coming back to this because that's our standard of review. That's the way we review a case like this. What was the substantial evidence that he misused government property? Was it the labeling LVMS? I believe that the labeling LVMS was very significant because it goes towards his intent, and the intent goes towards the seriousness of the removal penalty, because it was the fact that he put LVMS on that area, that prototype area. Wasn't it because of that ambiguous? I don't believe so, sir, because whether it's his own personal logo, Las Vegas Masonry Service, or whether he's actually putting Las Vegas Motor Speedway on it, either way... It's government property. Either way, it's government property. And it's the fact that he destroyed that government property, and his supervisor testified that he had no permission to destroy something that he had made with Air Force... And that's a matter of credibility. Yes, sir. And as to the removal penalty, I think that the administrative judge did say that, while at first glance this penalty may seem harsh, I think the administrative judge went on to say that in light of the fact of... And I'm going to go and, excuse me, find my notes on that issue. The fact that Petitioner destroyed the goodwill that he had created in his 15 years of federal civilian service by his misuse of personal gain and benefit. That phrase, personal gain and benefit, appears in the Douglas Factor analysis no less than eight times. Clearly, the deciding official was troubled by the fact that Petitioner testified in a letter that he submitted on July 19th. That's at Appellate 37. He testified that he thought he could use the same barriers for the speedway, and that's why he chose to put LVMS on it rather than NAFB, or Dallas Air Force Base. That piece of testimony was very important towards the deciding official's decision, as he goes through the Douglas Factor analysis. Let me just go back one more time to something that I'm not sure if this is what Judge Newman meant, but it's something that was troubling me as well. The activity that you just described that was the basis for his discharge, was that activity that he had previously engaged in and his behavior indomitable? I don't believe so, ma'am. There is a record that he had a private— What we have on the record, because I agree, the facts are scanty, but what we have on the record is that it was common knowledge, quote, from Master Sergeant Hubrexi, he said, it was common knowledge Petitioner had a business on the side. We do not know, based on the facts in this record, whether that was a business that he conducted on Dallas Air Force Base itself, or whether it was in his garage. We don't know whether he was using government employees on government time, though I rather suspect he was hiring staff sergeants and whatnot on their off-duty time and paying them out of pocket. But we don't have any record that he was using government concrete or government property to engage in building prototypes or anything else prior to this. We do know he had a business that was called DNS Restoration. Petitioner admitted that at the time he built the prototype barrier, he didn't have a business called Las Vegas Masonry Service. That's at Appellate 141. He admitted at the time that I was building these barriers, I did not have a business called Las Vegas Masonry Service. So he may have had a business called DNS Restoration, but we don't know whether he was actively pursuing DNS Restoration-type work on government property or using government supplies or any of that. Before this occasion. Before this occasion. And, in fact, he didn't submit his bid to Mr. Stetzer under DNS Restoration Service. It just says, you know, here's a bid for 105 DC barriers, and it's going to cost about $63,000. A couple of other points that Petitioner brought up is whether or not, about the issue of the destruction of the barrier. Now, while it's true that Petitioner's duty was to clean up the Freedom Park area on a regular basis, he, in fact, that barrier, Master Sergeant Hubertzi testified that he was supposed to do that daily. And if it's his duty to clean up the park, why did the barrier sit there for six months? And then why did he pay somebody in that person's off-duty capacity to destroy the barrier? Those were some of the things that must have been going through the deciding official's mind as he's thinking about the choice of penalty. And when we go back to the choice of penalty, the Douglas factors, all of them were addressed. They are well reasoned. There is a rational basis for the decision of removal. And really, Your Honor, that's what we're here. I mean, it is not this court's responsibility to re-weigh the evidence. And although it's unfortunate that the record is scanty, it's this court's duty to determine whether the agency's charge is supported by substantial evidence and whether the penalty of removal is reasonable. Is there anything in substance that you need to tell us? No, I am done. Thank you, Your Honor. It is Mr. Crane's position that there is clearly a lack of substantial evidence. There was no misuse of government property. He was totally blindsided by these allegations brought against him. He was never hiding any of this. It had always been approved in the past. He never was required to submit paperwork. It was done. There was also, very importantly, no intent, no malicious involvement at all on his part as far as intent. And that's one of the criteria that was reviewed in the penalty factors, that because he did LVMS, he had taken it a step too far. And that's not even an issue. It didn't even matter what letters he was using, if the Air Force would even be interested in that, as far as having letters. And also, look at the past. That barrier is known as D.C. Barrier. I don't know if it has D.C. Barrier on it or if it's a barrier, but it was commonly referred to as a D.C. Barrier. Likewise, maybe if that could have been put on something, then he would have been, you know, the same allegations had been brought against him for something that had been done back in the 1990s. As far as the credibility issue, there are two prior disciplinary issues. But however, the administrative law judge specifically stated that those were not related to the merits of this case. And for them to be brought up now in regards to the merits should not be relevant because they were only going to go to credibility, not to the merits of whether there was any prior conduct or misconduct on the part of Donald Crane. It's also interesting to note that in January 2005, Sergeant Ygritte writes a very favorable reference for Donald Crane. And that's only a few months after all this had happened. So that's very critical. He was the go-to guy. But I think what's critical is that this was a concurrent operation. He was using a prototype barrier for the Air Force, and it just happened that he could also use it for the loss of a base on a speedway. It was months before all these allegations were brought against him that it was too expensive for the motor speedway to ride, whatever. He dropped it immediately and continued to work on it for the Air Force. It just was always because of that concurrent working on it that I think there's some confusion here. And then even when the D.C. barriers were used at NASCAR in March 2004, there was confusion and more rumors going around. And then you have Colonel Foti and Russell Collins coming on board in June 2004, hearing all this and not really knowing who they're dealing with, that they just basically lost a very valuable employee who was passionate about his work and faithful to his work and how he went about doing it, which had always been approved. And also with regard to the name, you know, his co-workers were well aware of Las Vegas Masonry Service. Yes, the proposal may have been Don Crane, but it was also Las Vegas Masonry Service. Thank you. Thank you, Ms. Hellman. Thank you. Please, let's take a look at your submission.